IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

HoneyBaked Foods, Inc.,                                      Case No. 3:08CV01686

            Plaintiff

   v.                                                                    ORDER

Affiliated FM Insurance Company,

            Defendant


      This is an insurance coverage case. Following the discovery of a pathogenic bacterium in

several production runs of its ham and turkey products, plaintiff HoneyBaked Foods, Inc., claimed

a loss of about $8 million under its "all-risk" policy with defendant Affiliated FM Insurance

Company. Affiliated FM denied the claim, asserting that exclusions under the policy leave

HoneyBaked without coverage for any part of the loss. HoneyBaked filed a complaint seeking a

declaratory judgment of its rights under the policy, and alleging breach of contract and bad faith.

Jurisdiction is proper under 28 U.S.C. § 1332.

      Pending are counter-motions for summary judgment on the declaratory judgment and breach

of contract claims. [Docs. 35, 41]. For the following reasons, the defendant's motion is granted in

part, and the parties are directed to propose a question or questions for certification to the Ohio

Supreme Court regarding whether, notwithstanding the failure of the policy at issue otherwise to

cover the plaintiff's loss, such loss might be covered, contingent on jury findings of disputed facts, under Ohio law.

## Background

### 1. HoneyBaked's Operations

HoneyBaked is a meat and poultry processor that processes cooked spiral sliced hams and turkey breasts at a facility in Holland, Ohio. As of November, 2006, HoneyBaked processed the cooked hams and turkeys from its suppliers by unpacking them, applying a glaze and then repackaging and freezing them for shipment to customers. The processing operations included a conveyor system equipped with hollow rollers to transport food products within the facility.

HoneyBaked is subject to routine inspection by the Food Safety and Inspection Service (FSIS), part of the United States Department of Agriculture (USDA).

### 2. Discovery of Listeria Monocytogenes and Resulting Claims

In early November 2006, the FSIS informed HoneyBaked that a sample from HoneyBaked's October 30, 2006, production run[1] had tested positive for listeria monocytogenes (listeria). Listeria is a pathogenic bacterium that causes listeriosis, an uncommon but potentially fatal disease. HoneyBaked hired Silliker Laboratories to test samples from the surrounding production dates. When HoneyBaked learned that surrounding production runs tested presumptively positive for listeria as well, it suspended its operations.

---

[1] A production run is the amount of product processed in one day or from clean-up to clean-up. The size of a lot can vary from day to day.

HoneyBaked also notified FSIS that some product from these production runs had already been introduced into commerce and purchased by consumers. FSIS concluded that a recall was not necessary at this point.

HoneyBaked worked with Dr. Joseph Cordray of Iowa State University to investigate how the listeria came into contact with the food products. Dr. Cordray and others identified the hollow roller of the conveyor system as the likely source of listeria. Further inspection revealed a sludge-like substance in the hollow roller. This substance tested positive for listeria. Ribo-typing[2] confirmed that the listeria discovered in the hollow roller matched the listeria found on the food products.

HoneyBaked immediately ceased use of the conveyer system and removed it from the facility. HoneyBaked also engaged in extensive cleaning and sampling procedures. After reviewing its policies and procedures, HoneyBaked resumed production.

On November 17, 2006, HoneyBaked pulled samples from production dates ranging from September 11, 2006 through October 17, 2006 to be tested by Silliker Laboratories. One turkey product and ninety-three ham products tested positive for listeria. Honeybaked began a voluntary recall of  the 46,941 pounds of fully cooked ham and turkey products produced between September 5, 2006 and November 6, 2006 that had been introduced into commerce.

The FSIS issued a notice of ineffective recall, and HoneyBaked suspended production again on November 29, 2006. HoneyBaked resumed production on December 9, 2006.

Ultimately, HoneyBaked recovered only 5,674 pounds of product. An additional 989,207 pounds of product remained segregated in HoneyBaked's freezers.

-------

[2] Ribo-typing determines whether two strains of a bacteria are identical.

3

In early August, 2007, HoneyBaked informed Affiliated FM that it planned to dispose of the nearly one million pounds of remaining product from the affected production runs. Soon after, HoneyBaked deposited the product in a local landfill, retaining one sample from each production date for further testing if necessary.

In November 2006, during the listeria investigation, HoneyBaked provided notice of its potential claim to Affiliated FM. HoneyBaked eventually submitted an insurance claim to Affiliated FM seeking reimbursement for the value of the disposed food products and additional losses resulting from the business interruptions.

### 3. The All-Risk Policy

HoneyBaked had purchased an all-risk insurance policy from Affiliated FM covering the period of April 1, 2006 through April 1, 2007. There is no dispute that HoneyBaked paid all required premiums and that the policy was in effect at the time HoneyBaked discovered the listeria in its production runs.

The policy insures against direct physical loss or damage to real property and personal property and provides recovery for damages sustained during periods of business interruption, except where excluded. Specifically, the policy states:

A. PERILS INSURED

This policy insures against all risks of direct physical loss or damage to insured property except as excluded under this policy.

[Doc. 35-14, at 11].

The policy sets forth two groups of exclusions:

F. PERILS EXCLUDED

4

GROUP I. This policy does not insure against the loss or damage caused directly or indirectly by or resulting from any of the following. Loss or damage is excluded regardless of any other cause or event whether or not insured under this policy that contributes concurrently or in any sequence to the damage.

\*    \*    \*

11. Fungus, mold or mildew, except as provided in Section D., Extensions of Coverage, Item 18.

\*    \*    \*

GROUP II. This policy does not insure against loss or damages caused by the following; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.

1. Defects in materials, faulty workmanship, faulty construction or faulty design.

2. Loss or damage to stock or materials attributable to manufacturing or processing operations while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon.

\*    \*    \*

5. Contamination, including but not limited to pollution.

[Doc. 35-14, at 25–27].

Item 18 under "Extensions of Coverage" provides specific coverage for fungus, mold and

mildew:

This policy is extended to cover the direct physical loss or damage to insured property caused by or resulting from fungus, mold or mildew, when fungus, mold or mildew is the direct result of direct physical loss or damage insured by this policy. This coverage includes any costs or expense to clean up, remove, contain, treat, detoxify or neutralize fungus, mold or mildew from insured property resulting from such loss or damage.

[Doc. 35-14, at 21].

5

The policy defines the phrase "fungus, mold or mildew" as "fungus, including but not limited to, mildew and mold; protist; wet rot; dry rot; or bacterium; or chemical matter or compounds produced or released by such fungus, protist, wet rot, dry rot, or bacterium." [Doc. 35-14, at 38].

The policy also contains a separate endorsement for business interruption coverage, which states:

> 1. COVERAGE PROVIDED:
>
> > In consideration of additional premium, this policy is extended to cover the actual loss sustained by the Insured due to the necessary interruption of production or business operations or services during the period of interruption of the following:
> >
> > > A. Gross Earnings, Rents, and Expenses to Reduce Loss; and
> > >
> > > B. Extra Expense;
> >
> > Directly resulting from direct physical loss or damage, of the type insured by this policy to property not otherwise excluded, utilized by the insured, and at a location, but only to the extent the Insured is able to make up production and resume or continue operations or services, partially or entirely, by utilizing damaged or undamaged property all whether or not at a location(s).

[Doc. 35-14, at 41].

### 4. Denial of Claim and Resulting Litigation

On February 20, 2008, Affiliated FM informed HoneyBaked that it would not cover any part of HoneyBaked's claim. In a March 4, 2008 letter, Affiliated FM explained that presence of listeria itself was not a physical loss or damage, and that it denied coverage for the product loss based on exclusions in the policy. Affiliated FM explained that it denied coverage of the business interruption losses, stating that because "there is no covered physical loss or damage, any business interruption associated with the listeria contaminated product . . . is also not covered." [Doc. 41, at 20].

6

Following the denial of its claims under the policy, HoneyBaked sued Affiliated FM, seeking declaratory judgment of its rights under the policy and alleging that Affiliated FM had breached the contract and acted in bad faith in denying the claim. Affiliated FM filed a motion for partial summary judgment on the declaratory judgment and breach of contract claims, and HoneyBaked answered with a counter-motion for partial summary judgment on the same claims.

## Standard of Review

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact. *Celotex*, *supra*, 477 U.S. at 323.

## Discussion

As Judge Rakoff of the Southern District of New York observed, "It seems that even if one insures against 'all risks,' one cannot insure against a lawsuit." *Allianz Ins. Co. v. RJR Nabisco*

*Holdings Corp.*, 96 F. Supp. 2d 253, 254 (S.D.N.Y. 1999). HoneyBaked initiated this lawsuit after Affiliated FM denied its claims under the all-risk insurance policy. Affiliate FM argues that the policy excludes the loss claimed by HoneyBaked and thus there was no breach of contract. HoneyBaked counters that it is entitled to summary judgment on both the declaratory judgment and breach of contract claims because:  1) the policy covers the loss; 2) the Group II exclusions are ambiguous; and 3) HoneyBaked had a reasonable expectation of coverage.

The party seeking to recover under an insurance policy generally bears the burden of demonstrating coverage under the policy as well as proving a loss. *See Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 87 Ohio St. 3d 270, 273 (1999). When an insurer denies liability coverage based on a policy exclusion, the insurer bears the burden of demonstrating its applicability. *See Continental Ins. Co. v. Louis Marx & Co.*, 64 Ohio St. 2d 399, 402 (1980). "In order to defeat coverage, the insurer must establish not merely that the policy is capable of the construction it favors, but rather that such an interpretation is the only one that can fairly be placed on the language in question." *Anderson v. Highland House Co.*, 93 Ohio St. 3d 547, 549 (2001).

Standard rules of contract interpretation apply when construing insurance policies.[3] *St. Mary's Foundry v. Employers Ins. of Wausau*, 332 F.3d 989, 992 (6th Cir. 2003) (applying Ohio law). Construing a written policy, therefore, is a matter of law for the court. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 245–46 (1978).

The primary goal of contract construction is to give effect to the intentions of the contracting parties. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987).  I give words and phrases their

---

[3]A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, the parties do not dispute the application of Ohio law.

ordinary meaning unless another meaning is apparent from the contents of the policy. *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (2003) (citing *Alexander*, *supra*, 53 Ohio St. 2d at 241). Where a contract is clear and unambiguous, the plain language of the contract determines the parties' rights and obligations. *ThorWorks Industries v. E.I. DuPont De Nemours and Co.*, 606 F. Supp. 2d 691, 696 (N.D. Ohio 2008).

If insurance contract provisions are reasonably susceptible to more than one interpretation, I must construe them "strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St. 3d 208, 211 (1988); *see Yeager v. Pacific Mut. Life Ins. Co.*, 166 Ohio St. 71 (1956) ("It is axiomatic that an insurance policy prepared by the insurer must be liberally construed in favor of the insured. Any ambiguity must be resolved against the insurer."). Nevertheless, this rule of construction should not be applied to force an unreasonable interpretation of the words of the policy. *Morfoot v. Stake*, 174 Ohio St. 506, 508 (1963).

HoneyBaked asserts, and Affiliated FM does not deny, that the policy covers its ham and turkey products, and that the nearly one million pounds of product it disposed of constituted a loss. Affiliated FM argues that the policy's "Group II" exclusions preclude coverage of this loss. HoneyBaked challenges the exclusion, and additionally claims that policy's "Fungus, Mold or Mildew" extension of coverage applies to the loss. HoneyBaked argues that even if the policy excludes its product loss, it is nevertheless entitled to recover for its business interruptions.

### 1. Group II Exclusions

Affiliated FM denied HoneyBaked's claim, citing three of the policy's Group II exclusions. Affiliated FM's motion for partial summary judgment addresses only the manufacturing and processing operations exclusion and the contamination exclusion.

9

HoneyBaked argues that the Group II exclusions are at the very least confusing, ambiguous and susceptible to more than one interpretation. HoneyBaked also contends that the exclusions cited by Affiliated FM are inapplicable to the loss caused by the listeria.

## A. Ambiguity

The policy excludes two groups of perils. The parties agree that the Group I exclusions are absolute. Regarding Group II exclusion, the policy states:

> This policy does not insure against loss or damages caused by the following; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.

At the heart of HoneyBaked's argument is the qualifying language, "however if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered."

HoneyBaked asserts that this wording "provides that resulting 'physical loss or damage insured by the policy' will be covered" – in effect, that the wording "eliminates the exclusion and reinstates the general coverage provision of the policy." [Doc. 41, at 28]. But this is not a reasonable interpretation of the language.

"Resulting" physical loss or damage is by definition not the same excluded physical loss or damage. It is damage emanating from a cause otherwise insured by the policy but which ultimately results  from an excluded cause. Damage "insured by the policy" is, in an all-risk policy, damage that is not excluded by the policy.

The language does not reinstate the general coverage provision for excluded causes, but rather reaffirms coverage for secondary losses which were ultimately caused by an excluded event. The language is awkward, but it is not indecipherable, nor does it create a nullity.

10

Applying the above insights, the exclusion reads:

> This policy does not insure against loss or damages caused by [*e.g.*, contamination]; however, if direct physical loss or damage [not excluded by] this policy results [from that contamination], then that resulting direct physical loss or damage is covered.

The law commonly refers to such qualifying language as an "ensuing loss" clause. *See Kappa Ethanol, LLC v. Affiliated FM Ins. Co.*, 2008 WL 4790997, *4 (D. Neb.) (construing nearly identical language as ensuing loss clause).

An ensuing loss provision is a "causation-in-fact-breaking link in coverage exclusions," establishing that independent losses caused by an excluded event are covered. *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 578-79 (6th Cir. 2010)[4]; *see Blaine Const. Corp. v. Ins. Co. of North America*, 171 F.3d 343, 349 (6th Cir. 1999) (applying Tennessee law) (finding ensuing loss clause reinstated coverage for water damage resulting from excluded faulty construction). *Cf. Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, 2002 WL 31495830, *19 (D. Or.) ("[T]he 'ensuing loss' clause [applies] in those rare cases where reasonable damage expected to be caused by faulty workmanship leads to another peril that causes damage beyond that normally expected."); *Montefiore Med. Ctr. v. Am. Prot. Ins. Co.*, 226 F. Supp. 2d 470, 479 (S.D.N.Y. 2002) ("An ensuing loss provision does not cover loss caused by the excluded peril, but rather covers loss caused to other property wholly separately from the defective property itself.").

---

[4] The Sixth Circuit also recognized that such a provision could also be interpreted as a redundancy that simply reminds the reader that what is not excluded is covered. *Id.* at 577-78. "Just as all light switches contain an 'on' *and* 'off' designation, so it is useful to spell out when coverage applies *and* does not apply." *Id.* The court was less persuaded by this reading, but found it unnecessary to decide between interpretations because, as is the case here, the insured could claim coverage under neither interpretation.

11

Even if I were to accept that the language is susceptible to two constructions – one which renders all Group II exclusions a nullity, and one which reinstates coverage for certain unforeseeable losses notwithstanding the exclusions – Ohio law directs courts to give rational construction to contracts and avoid inequitable, unusual, or unreasonable constructions. *Export-Import Bank of the United States v. Advanced Polymer Sciences., Inc*., 624 F. Supp. 2d 696, 704 (N.D. Ohio 2009) (citing *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 316 (Ohio 1996)). It is unreasonable to construe the language as eliminating the seven exclusions directly following it when an alternative, recognized and reasonable interpretation exists.

The qualifying language in the Group II exclusions constitutes an ensuing loss provision. It neither reinstates the general coverage provision nor is so confusing or ambiguous as to require an interpretation in favor of coverage.[5]

### B. Manufacturing and Processing Operations Exclusion

Affiliated FM asserts that manufacturing and processing operations exclusion precludes coverage. The policy states:

> GROUP II. This policy does not insure against loss or damages caused by the following; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.
> *   *   *
> 2. Loss or damage to stock or materials attributable to manufacturing or processing operations while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon.

Incorporating the language results in the somewhat baffling reading: "This policy does not insure against loss or damages caused by loss or damage to stock or materials attributable to

---

[5] HoneyBaked does not assert coverage of the ham and turkeys under the ensuing loss provision.

12

manufacturing or processing operations while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon."

HoneyBaked asserts that the exclusion is nonsensical. In the alternative, HoneyBaked argues that it is at least open to multiple interpretations. Relying on the annotation to a similar exclusion in an FM Global property damage policy, HoneyBaked suggests that the policy can be read as excluding coverage for damage attributable to the introduction of a wrong ingredient, a faulty ingredient, or a quantity not in accord with the product formula. HoneyBaked also believes the policy can be read as excluding damage attributable to normal manufacturing or processing operations. As listeria is not an ingredient or any part of HoneyBaked's normal operations, HoneyBaked contends its claim is not precluded by this exclusion.

Affiliated FM rejects these interpretations, claiming the repetition of "loss or damage" does not render the exclusion meaningless and that the annotation is completely irrelevant to determining the intent of the exclusions in this policy.

I find that regardless of the origin of HoneyBaked's reading of the exclusion, the reading is a reasonable one. The exclusion is thus at best ambiguous. Because ambiguity must be resolved in favor of the insured, this exclusion does not preclude HoneyBaked's claim.

### C. Contamination Exclusion

Affiliated FM relies on the contamination exclusion to preclude HoneyBaked's claim. The contamination exclusion of the policy reads:

> This policy does not insure against loss or damages caused by [contamination, including but not limited to pollution]; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.

[Doc. 35-14, at 25–27].

13

Affiliated FM asserts that the plain and ordinary meaning of contamination includes the listeria discovered on HoneyBaked's products.

The contract defines "pollution" as including bacteria. The Ohio Court of Appeals has found that the "usual and ordinary meaning" of "contaminate" is "to render unfit for use by the introduction of unwholesome or undesirable elements." *Hartory v. State Auto. Mut. Ins. Co.*, 50 Ohio App. 3d 1, 3 (1988) (citing Webster's Third New International Dictionary (1981) 491); *see also Richland Valley Prods., Inc. v. St. Paul Fire & Cas. Co.*, 548 N.W.2d 127, 131 (Wis. App. Ct. 1996) (collecting cases uniformly construing the term "contamination").

The presence of listeria on HoneyBaked's food products plainly renders the products unfit for consumption, and as such meets the ordinary, unambiguous definition of "contamination." *See Landshire Fast Foods of Milwaukee, Inc. v. Employers Mutual Cas. Co.*, 676 N.W.2d 528, 532 (Wis. App. Ct. 2003) (interpreting "contamination" to incorporate listeria monocytogenes in food products).

HoneyBaked does not directly challenge that contamination includes listeria. Rather, HoneyBaked argues that the exclusion does not apply because it distinguishes between damage caused by contamination and contamination damage. In the alternative, HoneyBaked believes that its claim is subject to an exception to the exclusion. Finally, HoneyBaked argues that regardless of whether the contamination exclusion precludes its claim, it reasonably expected that the policy would cover such losses and cannot therefore be denied coverage.

### i. "Damage Caused By Contamination" vs "Contamination Damage"

Some courts have held that where mold or contamination losses result from an event covered by an insurance policy, these losses are covered under policies excluding losses "caused by" mold

or contamination. *E.g.*, *Liristis v. Am. Family Mut. Ins. Co.*, 61 P.3d 22, 25 (Ariz. App. Ct. 2002) ("[M]old damage caused by a covered event is covered  .  .  .  . On the other hand, losses caused by mold may be excluded."); *Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 699 (N.J. 2004) (mold damage covered despite policy exclusion for "loss caused by mold" where plaintiff could prove mold resulted from rainstorm, a covered peril); *Graff v. Allstate Ins. Co.*, 54 P.3d 1266, 1268–69 (Wash. App. Ct. 2002) (contamination exclusion did not bar coverage where vandalism, a covered peril, resulted in the contamination).

Affiliated FM does not dispute HoneyBaked's conclusion that the hollow roller in the conveyor system harbored and spread the listeria. HoneyBaked claims that "[i]f the hollow roller was the sole cause of the contamination in the first instance, then the hollow roller caused the loss, not contamination." [Doc. 41, at 31]. But the hollow roller did not damage HoneyBaked's products. The listeria, deposited on the hams and turkeys from the sludge in the hollow roller, caused the loss.[6] Thus, the only preceding cause of the contamination loss was contamination. Because the policy expressly excludes contamination, the contamination of the hollow roller is not a covered event, and the resulting contamination is likewise not covered.

---

[6] Affiliated FM does not dispute that the hollow roller created the harborage site for the listeria in the facility. But even if I were to accept that the hollow roller, rather than the listeria it harbored, caused the contamination, HoneyBaked has not alleged that it is a covered event, and has presented nothing to create a genuine issue of material fact that it would be a covered event.

In fact, Group II exclusions include "design flaws" and "manufacturing and processing operations" [Doc. 35-14, at 26]. A design flaw seems apparent where a hollow roller capable of harboring dangerous bacteria and transferring it onto food products is incorporated into a food product assembly line. The hollow roller was indisputably part of the manufacturing and processing operations. Affiliated FM asserted both of these exclusions when it denied HoneyBaked's claim.

HoneyBaked has articulated nothing to demonstrate that there is a genuine issue of material fact as to the causation of the contamination, and has not asserted that a *covered* event caused the listeria contamination.

### ii. The Exception to the Exclusion

HoneyBaked also relies on the exception to the exclusion to argue that policy covers the loss. The exclusion provision, as stated above, includes the following exception: "however, if direct physical loss or damage insured by this policy results, then that resulting physical loss or damage is covered." HoneyBaked claims that the contamination of the ham and turkey products is a "resulting physical loss or damage" covered by the exception to the exclusion.

HoneyBaked asserts that the Tenth Circuit decision in *Leprino Foods Company v. Factory Mutual Insurance Company*, 453 F.3d 1281 (10th Cir. 2006), supports this interpretation. But I find the case distinguishable.

In *Leprino*, the insured, a cheese manufacturer, sought coverage under an all-risk policy purchased from Factory Mutual Insurance Company (FM). *Id.* at 1283. The policy contained a "contamination exclusion" which provided:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> 1) contamination including but not limited to the presence of pollution or hazardous material.

*Id.*

After receiving complaints of an off-flavor in its cheese, Leprino discovered that fruit juice concentrate had spilled in one of its warehouses, leading to the contamination of over eight million pounds of cheese. *Id.* at 1284. Leprino determined the cheese was not usable even as salvage for

16

feed to animals, and disposed of it in a landfill. *Id.* Leprino claimed the loss under its all-risk insurance policy, and FM denied the claim. *Id.* Leprino sued for breach of contract, and, after a trial focused on expectations of coverage, the jury returned a verdict in favor of FM. *Id.* at 1286.

On appeal, Leprino argued that the damages it sustained stemmed from "other physical damages" as set forth in the exception to the contamination exclusion. *Id.* The Tenth Circuit agreed that there was a genuine issue of material fact as to the cause of the damaged cheese and remanded the case for a new trial on the issue of the cause of the contamination. *Id.*

HoneyBaked argues that the contamination exclusions in *Leprino* are closely related to those in the present case because both include the "resulting loss" language. I disagree.

The policy in *Leprino* "excludes [contamination] unless directly resulting from other physical damage not excluded by this Policy." HoneyBaked's policy states:

> This policy does not insure against loss or damages caused by [contamination, including but not limited to pollution]; however, if direct physical loss or damage insured by this policy results, then that resulting direct physical loss or damage is covered.

While both policies include the word "resulting," the similarity ends there. "Resulting from other physical damage" cannot be analogized to "resulting direct physical loss or damage." The former refers to the root cause of a condition, the latter to a condition's effects.[7]

Even if HoneyBaked's policy could somehow be interpreted as the temporal opposite of what it states, the *Leprino* decision does not mandate coverage. Rather, as the court stated, "the only

---

[7]As discussed above, the exception or carve-out HoneyBaked relies on is recognized as an "ensuing loss" provision, which applies to cover events resulting from an excluded event which would, but for their origin in the excluded event, have been covered by the policy. To the extent there can be polar opposites in the convoluted language of insurance policies, these policies manifest such opposites.

reasonable reading of this language is that contamination losses resulting from perils otherwise covered by the policy are likewise covered and contamination losses resulting from perils expressly excluded by the policy are like-wise excluded." *Leprino*, *supra*, 453 F.3d at 1289 (quoting *Allianz*, *supra*, 96 F. Supp. 2d at 255). As discussed above, HoneyBaked has demonstrated neither a factual dispute as to the cause of the contamination nor that contamination resulted from a covered cause.

### iii. Reasonable Expectation of Coverage

HoneyBaked argues that it had no indication that the policy it purchased from Affiliated FM would not insure against listeria. While conceding that Ohio has not adopted the reasonable-expectations doctrine, HoneyBaked asserts that the Supreme Court of Ohio's decision in *Anderson v. Highland House Co.*, 93 Ohio St. 3d 547 (2001), "applied the doctrine in theory." [Doc. 52, at 3]. HoneyBaked asserts that its claim is comparable to that considered in *Anderson*, and that therefore I should find that the policy covers its loss.

In *Anderson*, the Supreme Court of Ohio considered whether carbon monoxide qualified as a "pollutant" such that the pollution exclusion in the policy precluded coverage for death and injuries resulting from residential carbon monoxide poisoning. The pollution exclusion in the policy stated that there was no coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants  .  .  .  ." *Id.* at 547. The policy defined "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." *Id.* at 548.

The Supreme Court of Ohio found that "the policy in question never clearly excludes claims for deaths or injuries caused by residential carbon monoxide poisoning." *Id.* at 549. The court held that "it is not the responsibility of the insured to guess whether certain occurrences will or will not

18

be covered based on nonspecific and general words or phrases that could be construed in a variety of ways." *Id.*

The court thus found that, based on the history and original purposes for the pollution exclusion, it was reasonable for the insured to believe that the policy would not exclude claims for injuries due to carbon monoxide poisoning. *Id.* at 549-50. Given this history and the general, nonspecific language of the exclusion, the court found the exclusion ambiguous and held against the insurer. *Id.*

HoneyBaked argues that, like the policy in *Anderson*, the all-risk policy here does not specifically exclude losses involving listeria, and therefore it was reasonable for it to assume that the policy would cover such losses. HoneyBaked argues that Affiliated FM was aware that losses from damage to food products was a major concern of HoneyBaked, and therefore the policy should cover the loss.

The decision in *Anderson* does not squarely fit this case. In *Anderson*, the Supreme Court of Ohio noted that the history of the pollution exclusion suggested that the policy did not contemplate carbon monoxide. HoneyBaked points to no similar history of the contamination exclusion.

Moreover, the fact that the policy failed to specify a particular bacterial contaminant cannot result in the exclusion being void. Requiring an insurer to list every possible species of bacteria that could contaminate a food product is neither rational nor necessary to defining and implementing an exclusion.

Nonetheless, the decision in *Anderson* could support the reasonable-expectations doctrine. The Ohio Supreme Court admitted as much, stating, "while we make no determination on the merits of the reasonable-expectations doctrine, this rationale could apply to the case at bar." *Id.* at 551.

The Supreme Court of Ohio considered the reasonable expectations doctrine in *Wallace v. Balint*, 94 Ohio St. 3d 182, 189 (2002). The court observed that the Second Restatement of Contracts explains the doctrine, providing:

> Where the other party has reason to believe that the party manifesting such assent would not do so if he knew the writing contained a particular term, the term is not part of the agreement.

*Id.*; 2 Restatement of Law 2d, Contracts (1981) § 211(3).

The court also quoted Professor Keeton's description of the doctrine's application to insurance policies: "The objectively reasonable expectations of applicants and beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *Id.* (quoting Keeton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L. Rev. 961, 967 (1970).

Although finding the arguments for applying the reasonable-expectations doctrine compelling, the court observed in *Anderson* that "there is not yet a majority on this court willing to accept the reasonable-expectations doctrine." 94 Ohio St. 3d at 189.

Lower Ohio courts, looking to *Anderson*, have considered arguments based on the reasonable-expectations doctrine. *I.G.H. II, Inc. v. Selective Ins. Co. of South Carolina*, 2007 WL 1378379, *5 (Ohio App. Ct.) (finding insured had no reasonable expectation of coverage); *Buckeye Ranch, Inc. v. Northfield Ins. Co.*, 134 Ohio Misc. 2d 10, ¶¶ 38–43 (Ohio Com. Pl. 2005) (finding

the Ohio Supreme Court's "pragmatic approach  .  .  .  to understanding what parties thought they would receive when buying insurance" similar to the reasonable-expectations doctrine).

While a close reading of the policy excludes the loss of HoneyBaked's food products caused by listeria, a jury could find that HoneyBaked reasonably believed its all-risk policy covered its biggest risk – spoilation during processing of its product. The record indicates that HoneyBaked believed the policy covered this type of loss, and this belief, a jury could find, was not unreasonable.

Because a jury could find that HoneyBaked had a reasonable expectation of coverage, and because the policy unambiguously excludes losses caused by contamination, the availability of coverage, notwithstanding the exclusion, turns on the question of whether the Ohio law will recognize the reasonable-expectations doctrine.

The best source for learning the definitive answer to this question is the Ohio Supreme Court. The best way to get the answer is to certify the question to that court. I conclude, accordingly, that, subject to further discussion with counsel for the parties, I should, and I anticipate that I shall, certify the appropriately framed question to the Ohio Supreme Court.

### 2. The Fungus, Mold or Mildew Provision

HoneyBaked argues that even if the general coverage provisions do not apply, its loss must still be covered under the policy's Fungus, Mold or Mildew provision.

The policy expressly excludes all coverage for "fungus, mold or mildew, except as provided in Section D. Extensions of Coverage, Item 18." [Doc. 35-14, at 27]. Item 18 under "Extensions of Coverage," provides:

> This policy is extended to cover the direct physical loss or damage to insured property caused by or resulting from fungus, mold or mildew, when fungus, mold or mildew is the direct result of direct physical loss or damage insured by this policy. This coverage includes any costs or expense to clean up, remove, contain, treat,

21

detoxify or neutralize fungus, mold or mildew from insured property resulting from such loss or damage.

[Doc. 35-14, at 21].

The definition of "fungus, mold or mildew" includes bacteria. *Id.* at 38.

HoneyBaked relies on the fact that bacteria, including the listeria which contaminated its ham and turkey products, is included in the definition of "fungus, mold or mildew" in its claim for coverage. But HoneyBaked ignores the plain language of the extension of coverage.

The extension applies only if "fungus, mold or mildew is the *direct result* of direct physical loss or damage *insured by this policy*." Where the fungus, mold or mildew is the direct result of damage excluded by the policy, as is the case here, the provision simply does not apply. Had the bacteria been the direct result of a flood, fire, or any conceivable risk not excluded by the policy, it would, under the terms of the extension, be a covered loss. But the plain language of the policy excludes coverage here.

### 3. The Business Interruption Provision

The parties agree that if the underlying claim is covered, either by the general coverage provisions or the fungus, mold or mildew provision, coverage for the corresponding business interpretation also exists. [Doc. 52, at 17]. This issue thus depends on whether HoneyBaked can rely on the reasonable-expectations doctrine to assert coverage.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT:

1.      The motion of the defendant for summary judgment be, and the same hereby is granted in part in accordance with this opinion; and

22

2.      By January 15, 2011, the parties shall jointly propose a question or questions for

certification to the Ohio Supreme Court regarding whether, notwithstanding the

failure of the policy at issue otherwise to cover the plaintiff's loss, such loss might

be covered, contingent on jury findings of disputed facts, under Ohio law; failing

agreement as to such question(s), the parties shall submit their counter-proposals,

supported by a brief statement of reasons in favor of their formulation and opposition

to that of the other party.

So ordered.


                                        s/James G. Carr
                                        United States District Judge

23